# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2025-KA-00656-SCT

***ERVING LUTRON RENCHER a/k/a ERVING
RENCHER a/k/a ERVING L. RENCHER***

***v.***

***STATE OF MISSISSIPPI***

| | |
|---|---|
| DATE OF JUDGMENT: | 06/03/2025 |
| TRIAL JUDGE: | HON. ROBERT THOMAS BAILEY |
| TRIAL COURT ATTORNEYS: | THOMAS EUGENE WHITFIELD, JR. |
| | BRENNAN SHIPLEY WARD |
| | ERICH GREGG JERSCHEID |
| | JAMES CORNELIUS GRIFFIN |
| | MARY SCHNELLER MARTIN |
| | SETH THOMAS CURREN |
| | KASSIE ANN COLEMAN |
| COURT FROM WHICH APPEALED: | KEMPER COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALEXANDRA LEBRON |
| DISTRICT ATTORNEY: | KASSIE ANN COLEMAN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/23/2026 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**GRIFFIS, JUSTICE, FOR THE COURT:**

¶1.     A jury found Erving Rencher guilty of child exploitation, and he was sentenced to life imprisonment. On appeal, he argues that the trial court erred by admitting unauthenticated evidence. Rencher also filed a supplemental pro se brief raising additional issues. Rencher's arguments are without merit, and his conviction and sentence are affirmed.

**FACTS AND PROCEDURAL HISTORY**

¶2.     Erving Rencher was indicted as a habitual offender in September 2023 for one count of child exploitation under Mississippi Code Section 97-5-33(6) (Rev. 2020). The indictment alleged that Rencher

> did knowingly entice, induce, persuade, seduce, solicit, advise, coerce or order a child, I.R. (DOB: 05/24/2009), to meet with Erving Lutron Rencher for the purpose of engaging in sexually explicit conduct, in violation of Section 97-5-33(6) . . . .

Rencher was tried by a Kemper County jury in May 2025.

¶3.     I.R.[1] testified that she lived with her mother in Tupelo, but she spent the summer of 2023 in Kemper County. She stayed with her aunt at the Deville Apartments and babysat her aunt's children during the day. I.R. also spent time with her cousin A.G., who was ten at the time. Rencher is A.G.'s father. I.R. testified that on June 11, 2023, she and A.G. were sitting outside of the apartment complex when A.G. saw her dad, Rencher. A.G. asked Rencher to take the girls to the store. A.G. purchased a snack, and Rencher drove them back to the Deville Apartments. I.R. and A.G. went inside A.G.'s mother's apartment, and I.R. later "received a [Facebook] friend request from Erving Rencher[,]" which she accepted. I.R. testified that Rencher's profile name was "LilErvin Re Rencher" and that Rencher appeared in the profile picture. Rencher and I.R. exchanged messages through Facebook, and pictures of the communication were entered into evidence without objection.

¶4.     The series of Facebook messages began with the "LilErvin Re Rencher" profile sending an image to I.R. of a dog that read, "I miss you!" The following messages then

---

[1] We use initials to protect the minors' identities. I.R. was fourteen in June 2023.

followed:

| | |
|---|---|
| [I.R.:] | ervin bye |
| [LilErvin Re Rencher:] | Uh huh |
| [I.R.:] | boy what? |
| [LilErvin Re Rencher:] | Can I have you |
| | Yes r noo |
| | Can I cause I want you don't tell my baby |
| [I.R.:] | she alr see it she right beside me |
| [LilErvin Re Rencher:] | Bra do u want me |
| | just come on out when she ain't around I got something 4 u |
| [I.R.:] | what you got 4 me? |
| [LilErvin Re Rencher:] | Dick and money baee |
| | Call me |
| [I.R.:] | no because your a grown man that's nasty quit texting me . . . |
| | foreal |
| | I don't want nothing from you anyway |

¶5.    I.R. testified that she did not meet with Rencher after receiving the messages nor had she had any contact with him since.  The same night, I.R. told her mother about the conversation, and her mother drove from Tupelo to get I.R.  They stayed the night at a hotel and went to the Kemper County Sheriff's Department to make a police report the next

3

morning.

¶6. Stephen Windish, the chief criminal investigator with Kemper County Sheriff's Department, arrested and interviewed Rencher. Rencher's interviews were played for the jury.

¶7. Windish testified that Rencher referred to his daughter A.G. as "my baby" in both his interview and in the messages sent to I.R. Windish also testified that Rencher admitted, during the interview, that the Facebook account belonged to him. Windish opined that the profile picture for the "LilErvin Re Rencher" account was "updated and uploaded" "two days prior to the incident" and that it was a photo of Rencher.

¶8. Windish also testified that Rencher told him in the interview that if he thought he did something wrong, he would have offered the victim money. A recording of a phone call that Rencher made from the Kemper County jail was later played for the jury. In the call, Rencher told the individual to contact the victim's family to offer money in exchange for dropping the charges. Rencher also sent a message from the jail in which he again offered money in exchange for I.R.'s family to drop the charges.

¶9. During the interview, Rencher confirmed his cell-phone number, and Windish "submitted the search warrant through AT&T for that cellphone number." Windish also "submit[ted] a search warrant to Meta for [I.R.'s] Facebook information."

¶10. As a result of the search warrant, Windish received "information about the browsing history and the coordinates on where [Rencher's] phone was being used" on June 11, 2023. Windish testified that between 6:00 p.m. and 9:00 p.m. on June 11, Rencher's phone was

4

accessing Facebook. Windish also stated that the "LilErvin Re Rencher" account sent ten messages to I.R.'s account between 7:16 p.m. and 9:41 p.m. on June 11. After obtaining the corresponding longitude and latitude points for the phone's Facebook activity, Windish "entered those coordinates into Google Earth."[2] Google Earth showed that the coordinates provided matched the location of the Deville Apartments. In summary, Windish testified that between 6:00 p.m. and 9:00 p.m. on June 11, Rencher's phone was accessing Facebook at the Deville Apartments. Windish opined that "[u]sing those coordinates and going against the web browsing history for the phone, . . . the phone was being accessed to Facebook . . . at the Deville Apartments." Notably, the defense did not object to any portion of this testimony.

¶11. At the close of the State's case-in-chief, Rencher moved for a directed verdict, which the trial court denied. The defense rested without calling any witnesses.

¶12. The jury found Rencher guilty of child exploitation, and the court sentenced him to life imprisonment as a habitual offender.[3] Rencher filed a motion for a judgment notwithstanding the verdict or, alternatively, a new trial, which the trial court denied. Rencher appealed.

**STANDARD OF REVIEW**

¶13. "When reviewing a trial court's decision to allow or disallow evidence, including

---

[2] Windish testified that Google Earth is "a public browsing website for people to just put in the addresses and places that they want to look up in the world." He further opined that it does not require specialized training to use and that anyone can access the website.

[3] Rencher had previously been convicted of aggravated assault and possession of cocaine with intent to distribute.

expert testimony, we apply an abuse of discretion standard." ***Clark v. State***, 315 So. 3d 987, 993-94 (Miss. 2021) (internal quotation marks omitted) (quoting ***Watts v. Radiator Specialty Co.***, 990 So. 2d 143, 145-46 (Miss. 2008)). "Therefore, the decision of a trial court will stand 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" ***Id.*** at 994 (quoting ***Miss. Transp. Comm'n v. McLemore***, 863 So. 2d 31, 34 (Miss. 2003)).

## DISCUSSION

### I.     Rencher's arguments are procedurally barred.

¶14.    Through his appellate counsel, Rencher argues that the trial court erred by admitting unauthenticated Facebook and AT&T evidence in violation of Mississippi Rules of Evidence 901 and 701. The State, however, argues that Rencher's claims are waived because he "failed to object within fifteen days of receiving notice that the State intended to offer the records" and because he "failed to contemporaneously object to the records at trial."

¶15.    Mississippi Rule of Evidence 902(11)(C) states that "[a]n adverse party waives any objection that is not: **(i)** stated specifically in writing; and **(ii)** served within 15 days after receiving the notice required by subparagraph (B), or at a later time that the parties agree on or that the court allows." As will be discussed further in Section II of this opinion, this subsection applies to certified records of a regularly conducted activity under Mississippi Rule of Evidence 803(6).

¶16.    Nothing in the record before us suggests that Rencher objected to the Facebook or AT&T records before trial, nor does he argue that he did. Additionally, Rencher did not

6

contemporaneously object to the admission of the records at trial or to Windish's testimony concerning the records. "Failure to make a contemporaneous objection waives this issue for appeal purposes." *Caston v. State*, 823 So. 2d 473, 503 (Miss. 2002) (internal quotation marks omitted) (quoting *Gatlin v. State*, 724 So. 2d 359, 369 (Miss. 1998)). "If no contemporaneous objection is made, the error, if any, is waived." *Id.* (internal quotation marks omitted) (quoting *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995)). Because Rencher failed to object at any time to the authenticity or admission of the Facebook or AT&T records or to the testimony of Windish, his arguments are procedurally barred.

¶17. Rencher failed to object before trial, contemporaneously at trial, or in a post-trial motion. Furthermore, Rencher has not asked this Court to review the issues for plain error. Rencher's arguments are procedurally barred. Notwithstanding the procedural bar, Rencher's issues are without merit.

## II. The Facebook and AT&T records were admissible as self-authenticating records.

¶18. Rencher argues that the trial court erred by admitting pictures of the Facebook messages and the cell-phone records because they "were never properly authenticated" in violation of Mississippi Rule of Evidence 901.

¶19. Mississippi Rule of Evidence 901(a) provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Mississippi Rule of Evidence 902(11) notes, however, that certified records of a regularly conducted activity are self-authenticating and "require no extrinsic evidence of authenticity in order to

7

be admitted[.]"

¶20. Mississippi Rule of Evidence 902(11)(A) states that a certification for records of regularly conducted activity "must show: **(i)** the custodian's or witness's first hand knowledge of the making, maintenance, and storage of the record; and **(ii)** that the record complies with Article X and Rules 803(6)(A)-(C) and 901(a)." Mississippi Rule of Evidence 803(6)(A)-(C) holds that a record of a regularly conducted activity is a "record of an act, event, condition, opinion, or diagnosis if: **(A)** the record was made at or near the time by – or from information transmitted by – someone with knowledge; **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; [and] **(C)** making the record was a regular practice of that activity[.]"

¶21. The records from Facebook and AT&T both had a certificate of authenticity attached. The certificate from Facebook contained a statement that the custodian of records "reviewed the records" and certified that "[t]he records provided are an exact copy of the records that were made and kept by the automated systems of Meta in the course of regularly conducted activity as a regular practice of Meta." The certificate additionally provided that "[t]he records were saved in electronic format after searching Meta's automated systems" and that they "were made at or near the time the information was transmitted by the Meta user." Similarly, the AT&T certificate certified that the author was "familiar with how the records were created, managed, stored, and retrieved" and that the records "are true duplicates of the original records in the custody of AT&T." The certificate provided that the records "were

8

made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of AT&T, and they were made by AT&T as a regular practice" and that the "records were generated by AT&T's electronic process or system that produces an accurate result[.]"

¶22. The Facebook and AT&T records comply with Rules 803(6)(A)-(C), 901(a), and 902(11). Therefore, the records were admissible as self-authenticating, and Rencher's claim lacks merit.

¶23. Rencher asserts that his case is similar to *Smith v. State*, in which this Court addressed whether Facebook messages between a defendant and victim were properly authenticated. *Smith v. State*, 136 So. 3d 424, 431 (Miss. 2014). In *Smith*, the Court held that "something more than simply a name and small, blurry photograph purporting to be [the defendant] is needed to identify the Facebook account as his in the first place."[4] *Id.* at 433. Ultimately,

---

[4] The Court noted that "something more" could comprise the following scenarios:

> the purported sender admits authorship, the purported sender is seen composing the communication, business records of an internet service provider or cell phone company show that the communication originated from the purported sender's personal computer or cell phone under circumstances in which it is reasonable to believe that only the purported sender would have access to the computer or cell phone, the communication contains information that only the purported sender could be expected to know, the purported sender responds to an exchange in such a way as to indicate circumstantially that he was in fact the author of the communication, or other circumstances peculiar to the particular case may suffice to establish a prima facie showing of authenticity.

*Smith*, 136 So. 3d at 433 (internal quotation marks omitted) (quoting *Tienda v. State*, 358 S.W. 3d 633, 639-41 (Tex. Crim. App. 2012)).

the Court found that there was not sufficient evidence linking the Facebook profile and messages to the defendant. *Id.* at 433-35. To the contrary, here, in addition to the name of the profile and the photograph of Rencher, evidence was presented that Rencher's cell phone was accessing Facebook at the Deville Apartments at the time the messages were sent and that Rencher had dropped I.R. and A.G. off at the Deville Apartments not long before I.R. received the first Facebook message with an image that read, "I miss you!" Additionally, the author of the messages did not deny being Rencher when I.R. called them "Ervin"; the author referred to A.G. as "my baby," and Rencher called A.G. "my baby" during his interview with Windish; Rencher admitted that the Facebook account and profile picture belonged to him; and Rencher stated in his interview that he would bribe a victim if he thought he did something wrong and then he did later try to reach out to I.R.'s family and offer them money to drop the charges. The combination of all of these facts create sufficient evidence to link Rencher both to the Facebook account and the messages that were sent to I.R. Therefore, the messages were properly authenticated.

### III. Windish properly testified as a lay witness.

¶24. Rencher also argues that "Windish offered expert opinion evidence that was only admissible under Mississippi Rule of Evidence 702, even though he was never qualified as an expert."

¶25. Mississippi Rule of Evidence 701 provides that

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> **(a)** rationally based on the witness's perception;

10

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Rule 702 states that:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

¶26. Rencher relies on *Collins v. State*, 172 So. 3d 724 (Miss. 2015). In *Collins*, this Court found that "while the technology underlying cell identification is not extremely difficult to understand, utilizing cell identification to locate a person does require specialized knowledge regarding such technology[.]" *Id.* at 741. The Court further found:

testimony that simply describes the information in a cell phone record is properly lay testimony. Likewise, testimony that merely informs the jury as to the location of cell phone towers may properly be lay testimony when it is based upon the personal observations of the witness. But testimony that goes beyond the simple descriptions of cell phone basics, specifically testimony that purports to pinpoint the general area in which the cell phone user was located based on historical cellular data, requires scientific, technical, or other specialized knowledge that requires expert testimony.

*Id.* at 743 (footnotes omitted). The Court went on to say that "some specialized knowledge beyond that of the average, randomly selected adult is required to analyze cellular phone

11

records and other data to determine the location, general or specific, of a certain cell phone." *Id.* at 744. The Court ultimately found that the admission of the cellular evidence by a lay witness was not harmless error because it was the only evidence at trial to place the defendant in the same geographic area as the victim at the time of a murder. *Id.*

¶27. The State, however, points to *Smith v. State*, 373 So. 3d 586, 592 (Miss. Ct. App. 2023), in which the Court of Appeals has since held that an officer's testimony "that he took the longitude and latitude coordinates from [the victim's and defendant's] phone records that had been provided by AT&T and entered them into Google Earth" "was not complex or technical, necessitating specialized knowledge or training." *Id.* (internal quotation marks omitted) (quoting *Manning v. State*, 269 So. 3d 216, 220 (Miss. Ct. App. 2018)). The Court of Appeals held that it was not error for the officer to testify as a lay witness. *Id.*

¶28. Windish testified that he submitted a search warrant through AT&T for Rencher's cellphone number and to Facebook for I.R.'s Facebook account information. In return, he received "information about the browsing history and the coordinates on where [Rencher's] phone was being used[.]" Windish testified that the "LilErvin Re Rencher" Facebook account exchanged messages with I.R.'s Facebook account between 7:16 p.m. and 9:41 p.m. on June 11. Windish explained that he entered the corresponding longitude and latitude points for the phone's Facebook activity into Google Earth, which matched to the location of the Deville Apartments.

¶29. These facts are more similar to those in *Smith* than in *Collins*, and Windish's testimony was not complex or technical in nature such that it required specialized knowledge

12

or training.  Therefore, the trial court did not err by allowing Windish to testify as a lay witness.

## IV.    Issues Raised in Rencher's Pro Se Supplemental Reply Brief

¶30.    Rencher filed a pro se "Supplemental Reply Brief/Sworn Affidavit."  Rencher argues that (1) his "mistake of fact relieves [him] of criminal liability"; (2) "the trial court abused its discretion and allowed a manifest constitutional error in allowing . . . Windish to testify . . . as an expert witness about personal Facebook Meta accounts"; (3) the trial court erred by admitting self-authenticating documents; (4) his sentence constitutes cruel and unusual punishment; (5) the trial court committed plain error by allowing Windish to testify as an expert; (6) "the trial court was without authority to impose a life sentence without parole"; and (7) he received ineffective assistance of counsel.[5]

¶31.    Rencher filed his brief pursuant to Mississippi Rule of Appellate Procedure 28(b). But his brief was untimely under Mississippi Rule of Appellate Procedure 31(b).  Rule 31(b) states that the reply brief should be filed within fourteen days after the filing of the appellee's brief.  M.R.A.P. 31(b).  The State's brief was filed on March 6, 2026, and Rencher's supplemental reply brief was filed May 14, 2026.[6]  Rencher did not seek leave or request additional time to file his brief.  Additionally, Rencher's brief does not comply with Rule 28. Rule 28(a)(7) states that "[t]he argument shall contain the contentions of appellant with

---

[5] Because the admission of self-authenticating documents and Windish's testimony as a lay witness were already addressed above, Rencher's arguments as to issues 2, 3, and 5 need not be discussed again.

[6] Rencher's appellate counsel did not file a reply brief.

respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(7). Rencher's arguments do not contain record citations and incorporate few citations of authority. However, "this Court will take into account when a prisoner is proceeding pro se and grant some degree of leniency." *Hesler v. Alcorn Cnty. Corr. Facility*, 315 So. 3d 1040, 1042 (Miss. 2021) (citing *Goodin v. Dep't of Hum. Servs.*, 772 So. 2d 1051, 1054 (Miss. 2000)). Notwithstanding the procedural bar, Rencher's pro se issues are similarly without merit.

### A. Rencher's alleged "mistake of fact" does not relieve him of criminal liability.

¶32. For the first time, Rencher now argues that "from appearance alone[,]" I.R. "was a fully developed female woman" and "could easily manipulate one[']s assumption concerning her age." Rencher further opines that he "never . . . possessed the intentions to solicit sex with a minor" and that if he had asked I.R. her age, this case would not exist. Rencher goes on to argue that "this omission/mistake of fact relieves [him] of criminal liability only if his belief is of such a nature that the conduct would have been lawful had the facts been as he reasonably supposed them to be" and that his "mistake negates the mens rea requirement."

¶33. Without citing authority, Rencher states that "a person shall not be found guilty of a crime if the act or omission to an act constituting the crime was induced by misapprehension of fact which, if true, would have justified the act or omission."

¶34. The Mississippi Model Jury Instructions[7] provide:

---

[7] "[T]he model jury instructions are only guidelines and have not been adopted by this Court." *Baker & McKenzie, LLP v. Evans*, 123 So. 3d 387, 408 (Miss. 2013).

"Ignorance" or "Mistake of Fact" is a defense to the commission of a crime provided that:

1. The mistaken belief is honestly held; and

2. The belief is of such a nature that the conduct would have been lawful and proper, had the facts been as they were believed to be; and

3. The mistaken belief is not the result of the negligence or fault of the defendant.

Miss. Jud. Coll., *Mississippi Practice Series: Mississippi Model Jury Instructions (Criminal)* § 2:9 (2d ed.) Westlaw (database updated Oct. 2025).

¶35.    No evidence in the record supports Rencher's new claim that he was mistaken about I.R.'s age, and this assertion was never mentioned in Rencher's interview or at trial. Instead, his defense was simply that his phone was hacked and that he was not the person who sent the messages. As Rencher points out, if he had asked I.R. of her age before sending the messages, he would not have mistakenly believed that she was an adult. Thus, any "mistaken belief" is the result of Rencher's own negligence, and mistake of fact is therefore not a defense to his actions. This issue is without merit.

### B.    Rencher's sentence is not cruel and unusual.

¶36.    Rencher next argues that his sentence constitutes cruel and unusual punishment and is disproportionate under the Eighth Amendment. He asserts that the State offered him three "back room off-the-record plea deals down to two years of incarceration[.]" But because he decided to "exercise his constitutional [right] to a trial by jury[,]" the court "punished" Rencher with a life sentence.

¶37.    Rencher again cites no authority to support his contentions. Rencher's sentence was

15

enhanced because he is a habitual offender under Mississippi Code Section 99-19-83 (Rev. 2020). Section 99-19-83 states:

> Every person convicted in this state of a felony who shall have been convicted twice previously of any felony or federal crime upon charges separately brought and arising out of separate incidents at different times and who shall have been sentenced to and served separate terms of one (1) year or more, whether served concurrently or not, in any state and/or federal penal institution, whether in this state or elsewhere, and where any one (1) of such felonies shall have been a crime of violence, as defined by Section 97-3-2, shall be sentenced to life imprisonment[.]

¶38. Rencher was considered a habitual offender due to his prior convictions of aggravated assault and possession of cocaine with intent to distribute. For his aggravated assault conviction, Rencher was sentenced to ten years and served more than seven years. For possession, he was sentenced to eight years to serve, four years suspended, and four years of probation, and he served at least sixteen months. Evidence presented proved, beyond a reasonable doubt, that Rencher was a habitual offender under Section 99-19-83, and thus, his sentence was not cruel and unusual or disproportionate. *See Russell v. State*, 346 So. 3d 435 (Miss. 2022) (affirming a life sentence without the possibility of parole for a habitual offender convicted of possession of marijuana).

### C. The trial court acted within its authority when sentencing Rencher to life imprisonment.

¶39. Rencher also asserts that "the trial court was without authority to impose a life sentence without parole without the determining factors of the empaneled jury" and cites *Erlinger v. United States*, 602 U.S. 821, 144 S. Ct. 1840, 219 L. Ed. 2d 451 (2024). Rencher argues that the trial court erred by sentencing him as a habitual offender because (1) a

Mississippi Department of Corrections "pen pack" was not produced; (2) MDOC staff did not interpret his "pen pack"; (3) no bifurcated trial established habitual-offender status; and (4) "the jury was not held to address the habitual offender portion of the trial."

¶40. Rencher is mistaken, however. At his sentencing hearing, the State entered into evidence a certified "pen pack" from MDOC without objection by the defense. "We have held that pen-pack records may constitute competent evidence." *Conner v. State*, 138 So. 3d 143, 151 (Miss. 2014) (citing *Taylor v. State*, 122 So. 3d 707, 709, 711 (Miss. 2013)). The State introduced a certified copy of Rencher's "pen pack", and this was competent evidence for the court to find that Rencher was a habitual offender without a member of MDOC staff testifying or interpreting the documents.

¶41. This Court has held that "when the defendant is indicted as a habitual offender, a jury is to decide the question of guilt and subsequently the circuit judge is to serve as the finder of fact in determining whether the habitual offender part of the indictment is established by the requisite degree of proof." *Id.* (citation modified). "When habitual offender status is alleged and where the accused goes to trial, the *trial court* must hold a separate hearing *without a jury* to determine whether habitual status should be imposed." *Nathan v. State*, 552 So. 2d 99, 106 (Miss. 1989) (emphasis added). After returning its guilty verdict, the jury was dismissed, and the trial court held a separate sentencing hearing. Rencher was not entitled to a jury determining his status as a habitual offender. The trial court had the authority to determine whether Rencher was a habitual offender and to impose a sentence on him.

¶42. While Rencher cites *Erlinger* in his brief, he fails to make meaningful argument as to how it directly applies to his case. In *Erlinger*, the Supreme Court considered "whether a judge may decide that a defendant's past offenses were committed on separate occasions under a preponderance-of-the-evidence standard, or whether the Fifth and Sixth Amendments require a unanimous jury to make that determination beyond a reasonable doubt." 602 U.S. at 825.

¶43. Erlinger faced a sentencing enhancement under the Armed Career Criminal Act, which increased his "up to 10 year" sentence to "a minimum of 15 years and a maximum of life." *Id.* at 825 (first citing 18 U.S.C. § 924(a)(2); then citing 18 U.S.C. § 924(e)(1)). Erlinger argued that his prior convictions[8] "had not occurred on four separate occasions but during a single criminal episode," such that the ACCA requirements were not met. *Id.* at 827. The Supreme Court ultimately held that, in order to increase a defendant's punishment under the ACCA, that defendant has the right for a jury to determine whether their past offenses were committed on separate occasions. *Id.* at 833.

¶44. The Court of Appeals recently decided a case involving a similar argument involving Mississippi Code Section 99-19-81 (Rev. 2020), which governs sentencing for nonviolent habitual offenders. *Crowley v. State*, 432 So. 3d 936, 941-42 (Miss. Ct. App. 2026). The Court of Appeals determined that the United States Supreme Court's holding in *Erlinger* did not apply to the appellant's sentencing under Section 99-19-81. *Id.* at 942. The Court of Appeals found:

---

[8] For the prior convictions, the government alleged that "within a span of days Mr. Erlinger burglarized a pizza shop, a sporting goods store, and two restaurants." *Id.* at 826.

18

> Unlike in ***Erlinger***, where the application of the ACCA impacted the defendant's actual sentence by increasing the minimum and maximum punishments to be imposed, Crowley's sentencing under section 99-19-81 did not increase the sentencing range he faced. Rather, as in [***Fogleman v. State***, 283 So. 3d 685 (Miss. 2019)], Crowley's sentencing as a non-violent habitual offender only affected the portion of the prescribed sentence that he was to serve. *See* Miss. Code Ann. § 99-19-81. Accordingly, we find no merit to Crowley's claims that the United States Supreme Court's holding in ***Erlinger*** applies to his sentencing under section 99-19-81.

*Id.* at 942.

¶45. Section 99-19-81 provides that habitual criminals "shall be sentenced to the maximum term of imprisonment prescribed for such felony . . . and such sentence shall not be reduced or suspended nor shall such person be eligible for parole or probation." § 99-19-81. But Section 99-19-83 provides that habitual criminals with a conviction for at least one crime of violence "shall be sentenced to life imprisonment, and such sentence shall not be reduced or suspended nor shall such person be eligible for parole, probation, or any other form of early release[.]" § 99-19-83.

¶46. Rencher was sentenced to life imprisonment as a violent habitual offender under Section 99-19-83. The crime for which Rencher was found guilty, child exploitation under Section 97-5-33, has a sentencing range of five to forty years. Miss. Code Ann. § 97-5-35 (Rev. 2020). Rencher's potential minimum and maximum punishments *were* increased due to his sentencing as a violent habitual offender. But Rencher did not argue at trial or sentencing that ***Erlinger*** was applicable to his case, nor did he argue that his prior convictions were committed as part of the same criminal episode. In fact, Rencher was convicted of aggravated assault in July 2014 and of possession of cocaine with intent to

distribute in October 2016. Additionally, Rencher did not object to his "pen pack" being admitted into evidence, and his counsel stated, "we don't deny that Mr. Rencher does, in fact, have those two convictions[.]" ***Erlinger*** is not applicable to the case at bar, and Rencher was not entitled to have a jury determine whether his prior convictions occurred during a single criminal episode.

### D. Rencher's claim of ineffective assistance of counsel would be more appropriately brought in a petition for post-conviction relief.

¶47. Rencher argues that his trial counsel was ineffective for several reasons, including failing to interview a key witness and failing to "make objections at crucial stages[.]" In order to prove ineffective assistance of counsel, a defendant must show that (1) "counsel's performance was deficient" and (2) "the deficient performance prejudiced the defense." ***Strickland v. Washington***, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A "defendant must show that counsel's representation fell below an objective standard of reasonableness." ***Id.*** at 688. But there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" ***Id.*** at 689. To demonstrate prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." ***Id.*** at 694.

¶48. "[G]enerally, ineffective-assistance-of-counsel claims are more appropriately brought during post-conviction proceedings." ***Bell v. State***, 202 So. 3d 1239, 1242 (Miss. 2016) (internal quotation marks omitted) (quoting ***Dartez v. State***, 177 So. 3d 420, 422-23 (Miss.

2015)). We have explained:

> This Court addresses ineffective-assistance-of-counsel claims on direct appeal only where "[1] the record affirmatively shows ineffectiveness of constitutional dimensions, or [2] the parties stipulate that the record is adequate and the Court determines that findings of fact by a trial judge able to consider the demeanor of witnesses, etc.[,] are not needed."

*Id.* (quoting ***Read v. State***, 430 So. 2d 832, 841 (Miss. 1983)). "Issues which may be raised in post-conviction proceedings may also be raised on direct appeal if such issues are based on facts fully apparent from the record." M.R.A.P. 22(b).

¶49. Here, the record does not affirmatively show ineffectiveness of constitutional dimensions nor have the parties stipulated that the record is adequate for this Court to make a determination without findings of the trial judge. Further, the issue of whether Rencher's counsel was ineffective is not fully apparent from the record.

¶50. The record is insufficient, thus Rencher's ineffective-assistance-of-counsel claim is denied, but his right to raise the issue in a petition for post-conviction relief is preserved.

## CONCLUSION

¶51. Rencher's conviction and sentence are affirmed.

¶52. **AFFIRMED.**

**RANDOLPH, C.J., KING AND COLEMAN, P.JJ., ISHEE, SULLIVAN AND BRANNING, JJ., CONCUR.**

21